**IN THE UNITED STATES DISTRICT COURT**
                       **FOR THE DISTRICT OF MARYLAND**

IFCO SYSTEMS                          *
NORTH AMERICA, INC.                   *
                                      *
        v.                            *   Civil Action WMN-09-2874
                                      *
AMERICAN HOME                         *
ASSURANCE COMPANY                     *

        *   *   *   *   *   *   *   *   *   *   *   *

                              **MEMORANDUM**

    Currently pending before the Court is Defendant American Home Assurance Company's Motion for Summary Judgment.[1]  ECF No. 36.  The parties have fully briefed the motion and it is ripe for a decision.  After reviewing the pleadings and applicable case law, the Court determines that: (1) no hearing is necessary, see Local Rule 105.6; and (2) the motion will be granted for the reasons set forth below.

**I.   BACKGROUND**

    This is an insurance coverage dispute.  Plaintiff IFCO Systems North America, Inc. (IFCO) contracted with third-party Rite Aid of Maryland, Inc. (Rite Aid) to provide pallet management and logistics support at Rite Aid's warehouse in Perryman, Maryland.  At all times relevant to this dispute, IFCO

---

[1] Defendant American Home Assurance Company also recently filed a motion for leave to file a supplemental evidentiary memorandum.  ECF No. 49.  The Court does not require additional briefing and the motion will be denied as moot.

had a general liability insurance policy (Policy, Compl. Ex. 1) through Defendant American Home Assurance Company (AHAC).

In October 2008, Rite Aid notified IFCO that it believed IFCO employees had stolen over $1.5 million in Rite Aid goods from the Perryman facility during a four-month period in 2007. Pursuant to the Policy, IFCO immediately sought AHAC's agreement to defend against and provide coverage for Rite Aid's claims. AHAC promptly investigated the claim but eventually declined to defend or indemnify IFCO for any liability stemming therefrom. IFCO then filed this lawsuit seeking a judicial declaration that the Policy covered the Rite Aid claim.

Later, Rite Aid sued IFCO in a separate action (Rite Aid Action) alleging the following six causes of action: (1) negligent hiring, training, supervision and retention; (2) contract indemnification; (3) trover and conversion; (4) common law indemnification; (5) negligence; and (6) breach of contract. In response, AHAC agreed to defend IFCO in the Rite Aid Action under a full reservation of rights. AHAC then filed the instant motion for summary judgment arguing that the Policy does not cover the underlying claim.

## II. **THE POLICY**

The Policy at issue provides coverage for "sums that [IFCO] becomes legally obligated to pay as damages because of . . .

2

'property damage' to which [the] insurance applies."[2]  Policy ¶ I.1.a.  The "insurance applies . . . only if[] [t]he . . . 'property damage' is caused by an 'occurrence.'"  Policy ¶ I.1.b.(1).  The Policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  Policy ¶ V.13.  This entire dispute turns upon the meaning of "occurrence."  AHAC argues that the intentional act of an IFCO employee to steal Rite Aid goods does not constitute an "occurrence" as the term is defined in the Policy.  IFCO argues the opposite.

## III. LEGAL STANDARD

Summary judgment is proper if the evidence before the Court, consisting of the pleadings, depositions and declarations, establishes that there is no genuine dispute of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  A party seeking summary judgment bears the initial responsibility of informing the Court of the basis of its motion and identifying the portions of the opposing party's case which it believes demonstrate the absence of a genuine issue of material fact.  <u>Celotex</u>, 477 U.S. at 323.

---

[2] "Property damage" is defined in part as the "[l]oss of use of tangible property that is not physically injured."  Policy ¶ V.17.b.  AHAC does not argue that the theft does not constitute "property damage" within the meaning of the Policy.

3

If the moving party overcomes its initial burden, the non-moving party must, in order to withstand the motion, produce its own evidence in the form of depositions, declarations, or other documentation demonstrating the presence of a triable issue of fact. Id. at 324. While unsupported speculation is insufficient for this purpose, Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987), any dispute over facts that may affect the outcome of the case is considered "material" and will defeat a summary judgment motion, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). At all times, the non-moving party is entitled to have "all reasonable inferences . . . drawn in its respective favor." Felty, 818 F.2d at 1128.

**IV.  ANALYSIS**

Georgia law governs the Policy. Under Georgia law, courts must "look to the allegations of the [underlying] complaint to determine whether a claim covered by the policy is asserted." City of Atlanta v. St. Paul Fire & Marine Ins., 498 S.E.2d 782, 784 (Ga. Ct. App. 1998). In this case, the Court must review the allegations in the Rite Aid Action to determine whether the alleged events given rise to the claim constitute an "occurrence" under the Policy. To aid this task, the law of Georgia also provides guidance regarding various definitions in dispute.

The Policy defines an "occurrence" as an "accident." An "accident," under Georgia law, means "an event which takes place without one's foresight or expectation or design," O'Dell v. St. Paul Fire & Marine Inc. Co., 478 S.E.2d 418, 420 (Ga. Ct. App. 1996), and involves "an unexpected happening rather than one occurring through intention or design," Allstate Ins. Co. v. Grayes, 454 S.E.2d 616, 618 (Ga. Ct. App. 1995). Accidents have accidental causes, which are defined as unintentional acts. See Owners Ins. Co. v. James, 295 F. Supp. 2d 1354, 1364 (N.D. Ga. 2003). Georgia law distinguishes between unintentional acts that cause accidents and thus unintentional injuries, and intentional acts that may nevertheless also cause unintentional injuries. Id. Only the former give rise to "accidents"; intentional acts cannot do so. Thus, the inquiry must focus on the intention behind the act that caused the unexpected event.

The Rite Aid Action includes six causes of action, including claims for contract breach, conversion and trover, and negligence. In theory, a party may breach a contract either intentionally or unintentionally, and negligence by definition is an unintentional tort. Conversion and trover, however, require an intentional act. Under Maryland law, "[c]onversion is an intentional tort, consisting of two elements, a physical act combined with a certain state of mind." Darcars Motors of

5

Silver Spring, Inc. v. Borzym, 841 A.2d 828, 835 (Md. 2004).[3] There are "a wide range of different states of mind" that satisfy the intent element of conversion in Maryland. Id. at 836. "At a minimum, a defendant liable of conversion must have an intent to exercise dominion or control over the goods which is in fact inconsistent with the plaintiff's rights." Id. (internal quotation omitted).

IFCO does not argue that the alleged conversion of Rite Aid's property was unintentional. Rather, IFCO argues that while the IFCO employee who allegedly stole Rite Aid's goods did so intentionally, IFCO itself, as a corporation, had no intention at all of stealing the goods. Because the Policy "must be read from IFCO's perspective," IFCO argues the Court must also analyze the presence or absence of an intentional act from IFCO's perspective. Opp'n at 6, ECF No. 43. And as the theft occurred without IFCO's "foresight or expectation or design," the theft was an accident from IFCO's perspective as defined by the Policy. Opp'n at 6. Put differently, IFCO argues that "AHAC cannot deny coverage to IFCO on the basis of an intentional act by a third party." Opp'n at 4.

---

[3] The conversion allegedly occurred at Rite Aid's facility in Perryman, Maryland, and Rite Aid filed suit in Maryland state court. Consequently, Maryland tort law will apply to the Rite Aid Action. Nonetheless, conversion under Georgia law also requires an intentional act. See Decatur Auto Ctr., Inc. v. Wachovia Bank, N.A., 583 S.E.2d 6, 7 (Ga. 2003).

Under Georgia law, the intentional acts of a corporation's employee do not constitute an accident from the corporation's perspective for purposes of insurance policy coverage disputes, even if the corporation did not foresee or intend the employee's actions. See SCI Liquidating Corp. v. Hartford Fire Ins. Co., 181 F.3d 1210, 1216-17 (11th Cir. 1999) (applying Georgia law and citing Presidential Hotel v. Canal Ins. Co., 373 S.E.2d 671 (Ga. Ct. App. 1988), and O'Dell v. St. Paul Fire & Marine Ins. Co., 478 S.E.2d 418 (Ga. Ct. App. 1996)). Thus, when an insurance policy covers only "accidents," the policy will not, absent other policy language to the contrary, cover claims arising from the intentional acts of an insured's employees. Moreover, such a policy will also not extend to negligence claims where the insured-employer's alleged negligence is related to the intentional acts of an employee. O'Dell, 478 S.E.2d at 420.

Unlike the case at bar, which is premised upon alleged conversion, the intentional acts giving rise to the underlying claims in SCI Liquidating, Presidential Hotel, and O'Dell each involved sexual harassment, assault, battery, and similar torts. Nevertheless, each of those three cases involved intentional torts, and the animating legal principles are the same as those of the instant case. Here, the causes of action in the underlying dispute, including Rite Aid's claims for negligence

and negligent hiring, are all premised upon the alleged conversion of Rite Aid goods by an IFCO employee. The alleged conversion is, by definition, an intentional act. Even though IFCO, as a corporation, did not itself intend the conversion, the intentional act cannot constitute an "accident" under Georgia law and, therefore, cannot qualify as an "occurrence" under the Policy. As the underlying claim is entirely premised upon an event that does not constitute an "occurrence," the Policy does not cover the underlying claim.

Despite the Georgia case law cited above, IFCO cites two other Georgia cases in support of its position: Crook v. Georgia Farm Bureau Mutual Ins., 428 S.E.2d 802 (Ga. Ct. App. 1993), and Rucker v. Columbia Nat'l Ins., 705 S.E.2d 270 (Ga. Ct. App. 2010). Crook was an insurance coverage dispute involving an underlying claim in which the plaintiff's son intentionally killed himself in the defendant's home, and the plaintiffs sued the defendant for wrongful death. The defendant's homeowner's insurance policy covered personal injuries arising from an "accident." The Crook court held that because the son's death did not take place within the defendant's "foresight or expectation or design," the death was an "accident" from the defendant's perspective, notwithstanding the plaintiff's son's intentional acts, and the homeowner's insurance policy consequently covered the underlying claim.

Georgia courts have provided little explanation of the distinction between Crook, on the one hand, and Presidential Hotel and O'Dell, on the other. Indeed, the Eleventh Circuit faced a similar dilemma in SCI Liquidating, noting that "there is some difficulty in reconciling the different approaches taken in Crook and Presidential Hotel." 181 F.3d at 1216. To be sure, however, Crook is distinguishable from the cases which control this dispute. Most notably, Crook involved a homeowner's insurance policy and the actions of a private individual on another's private property. There is no theory of law under which the Crook plaintiff's son's actions could be imputed to the defendant homeowner. In contrast, O'Dell, Presidential Hotel, SCI Liquidating and this case all involve general liability insurance policies and corporations, which by definition can act only through their employees. It is plausible this distinction proves dispositive, and as O'Dell and Presidential Hotel are factually more similar than Crook to the case at bar, the Court is compelled to follow their guidance.

Rucker, another insurance coverage dispute, also involved distinguishable facts and legal principles. In Rucker, a portion of the underlying action involved a suit for wrongful death and negligent hiring against a home appliance service contractor. The contractor's trainee had allegedly entered the plaintiff's home "under color of employment," killed the

9

plaintiff's wife and kidnapped the plaintiff's son. The plaintiff alleged, inter alia, that the contractor was negligent in hiring the trainee because the contractor did not conduct a criminal background check on the trainee. The contractor's insurer filed a separate action seeking a declaration of its obligations.

The contractor's insurance policy provided coverage for damages arising from an "occurrence," which was defined as an "accident." At the contractor's deposition, he testified that he deliberately did not perform background checks on trainees. The Rucker court held that "[b]ecause [the contractor] intended to forgo conducting a background check on [the trainee], the omission was an event that took place with [the contractor's] foresight, expectation or design." Rucker, 705 S.E.2d at 274. "The event upon which [plaintiff's] claim was based was therefore not a covered occurrence," id., because the contractor's intentional omission was not an accident.

IFCO believes Rucker supports its argument because the Rucker court based its holding on the contractor-insured's intentional omission, whereas in this case, the underlying action does not allege IFCO engaged in any intentional acts or omissions. Opp'n at 8. While true, Rucker does nothing to undermine O'Dell, Presidential Hotel, and SCI Liquidating. The court's analysis in Rucker proceeded within the context of a

10

factual scenario in which the insured's intentional acts led to its liability. That is not the scenario here. Rucker answered a different question than the one posed in this case, and it did not consider whether the insured would have been entitled to coverage if the insured had not performed intentional acts leading to its liability. If anything, Rucker actually affirms O'Dell by citing it as an example in which the intentional acts of a third party were not a covered occurrence. See Rucker, 705 S.E.2d at 274 n.12. Thus, neither Rucker nor Crook advances IFCO's position.

Next, IFCO argues that the Policy's definition of "occurrence" "is ambiguous and can be read to include even intentional acts by IFCO employees." Opp'n at 9. IFCO points to the unreported case of Ameristeel Corp. v. Employers Mutual Cas. Co, No. 7:96 CV 85 HL, 2005 U.S. Dist. LEXIS 15715, 2005 WL 1785283 (M.D. Ga. 2005), in which a court applied Georgia law to interpret a definition of "occurrence" similar to the one here. In Ameristeel, a steel company sued its insurers to recover costs associated with environmental damage caused when the steel company's contractor illegally dumped flue dust, a toxic chemical. The insurance policy at issue defined "occurrence" as "an accident or event including continuous repeated exposure to conditions which results . . . in personal injury or property damage neither expected nor intended from the standpoint of the

insured." Id. at *3. The Ameristeel court held that "exposure . . . to conditions that result in property damage constitutes an occurrence within the meaning of [the] insurance contract[]," id., provided the exposure occurred during the policy period and notwithstanding the intentional acts of the contractor. Consequently, "coverage would have been triggered . . . when flue dust was first dumped or stored on a particular piece of property, exposing the soil to contamination that would result in property damage." Id. The Ameristeel court later opined that "it is arguably correct that continued dumping of the same substance in the same place could be considered 'continuous or repeated exposure to substantially the same general conditions,'" thereby rendering repeated dumping an "occurrence" within the meaning of the insurance policy. Id. at *7. Thus, the intentional dumping by the third-party contractor would have been an "occurrence" within the meaning of the relevant insurance policy. Ultimately, however, the court found that no qualifying occurrences took place during the policy period, and the insurer was not required to extend coverage.

IFCO argues Ameristeel is directly analogous to this case insofar as both cases involve the intentional, continuous, repeated acts of a third party. In turn, IFCO claims this Court should adopt Ameristeel's conclusions regarding "occurrences." Ameristeel, however, is not analogous to this case because it

12

involved intentional acts by a different company with which the insured contracted, whereas here the intentional acts were allegedly committed by the insured's employee.  In tort law and elsewhere, corporate liability for the actions of employees varies drastically from corporate liability for the actions of contractors.  In a similar argument, IFCO posits that "the repeated illegal takings [by an IFCO employee] from the same warehouse facility should constitute 'continuous repeated exposure to the same general conditions,'" thereby rendering the "repeated illegal takings" a coverable "occurrence."  Opp'n. at 11.  This result would be absurd.  By that logic, repeated intentional acts would fall within the definition of an "accident," even where an isolated intentional act may not.  Routinized theft cannot be accidental, even under insurance law.

IFCO further argues that the Policy provisions, read as a whole, imply that property losses due to theft will be covered by the Policy.  IFCO continues:

> AHAC cites solitary provisions of the [Policy] to argue that AHAC has no obligation to . . . IFCO . . . .  The provisions AHAC cites, however, when read in conjunction, and harmonized, with other provisions of the Policy lead to a different conclusion: that the subject Policy covered intentional acts by IFCO's employees performed outside the scope of their employment.

Opp'n at 12.  The problem with this argument is that the "solitary provisions" of the Policy cited by AHAC also happen to

13

be the Policy's operative provisions establishing the scope of coverage. While Georgia courts have provided some additional guidance as to the meaning of "accident," the plain language of the Policy is unambiguous. The Policy covers "occurrences." "Occurrences" are "accidents." The Court finds no ambiguity in these terms that would warrant a more expansive interpretation of the Policy. Moreover, the Policy's various terms are internally consistent, so there is no need to "harmonize" the coverage provisions with the remainder of the document.

Last, IFCO claims that, as a matter of public policy, this Court should deny AHAC's motion if there is a possibility of coverage for the underlying claim. As discovery in the underlying action has not yet closed, IFCO argues it may later develop facts that bring the event within the scope of the Policy. As stated above, courts must "look to the allegations of the [underlying] complaint to determine whether a claim covered by the policy is asserted." St. Paul Fire & Marine Ins., 498 at 784. "An insured's duty to defend turns on the language of the insurance contract and the allegations of the complaint asserted against the insured." Id. "Thus, it is only where the [underlying] complaint sets forth true factual allegations showing no coverage that the suit is one for which liability insurance coverage is not afforded and for which the insurer need not provide a defense." Penn-America Ins. Co. v.

Disabled American Veterans, Inc., 490 S.E.2d 374, 376 (Ga. 1997).

In this case, the underlying complaint is premised entirely on the alleged conversion of Rite Aid goods. IFCO does not argue the allegations are false or fraudulent, and no set of facts would render the alleged conversion an unintentional tort. Consequently, the Policy does not cover the Rite Aid Action as a matter of law, and IFCO's public policy argument fails. As a result, AHAC is not required to defend IFCO in the underlying dispute, nor is it responsible for indemnifying IFCO for any potential liability imposed therefrom, and AHAC's motion for summary judgment will be granted.

## IV. CONCLUSION

For the foregoing reasons, AHAC's motion for summary judgment, ECF No. 36, will be granted. The Court will issue a separate order to that effect.

```
               _____/s/_____
               William M. Nickerson
               Senior United States District Judge
```

June 23, 2011